IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| JAMES K. NESTLE, | ) | Civil No. 10-6203-JE |
| | ) | |
| Plaintiff, | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Mark A. Manning
Kathryn Tassinari
Harder Wells Baron & Manning, PC
474 Willamette Street
Suite 200
Eugene, OR 97401

Attorneys for Plaintiff

FINDINGS AND RECOMMENDATION - 1

Dwight C. Holton, U.S. Attorney
Adrian L. Brown, Asst. U.S. Attorney
District of Oregon
1000 S.W. Third Ave., Suite 600
Portland, OR 97204

Richard A. Morris
Special Asst. U.S. Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900  M/S 901
Seattle, WA 98104-7075

   Attorneys for Defendant

JELDERKS, Magistrate Judge:

  Plaintiff James Nestle brings this action pursuant to 42 U.S.C. § 405(g) and §

1383(c), seeking judicial review of a final decision of the Commissioner of Social Security

(the Commissioner) denying his application for Supplemental Security Income (SSI) benefits.

Plaintiff seeks an Order reversing the decision of the Commissioner and remanding this

action to the Social Security Administration (the Agency) for an award of benefits.

  For the reasons set out below, the decision of the Commissioner should be affirmed.


### **Procedural Background**

  Plaintiff filed an application for SSI benefits on October 31, 2006, alleging that he

had been disabled since October 26, 2005.

  After his application had been denied initially and upon reconsideration, plaintiff

timely requested a hearing before an Administrative Law Judge (ALJ).  At a hearing held

before ALJ Gary Elliot on December 1, 2008, plaintiff requested postponement so that he

could obtain representation.  ALJ Elliot granted that request, and a second hearing, at which

FINDINGS AND RECOMMENDATION - 2

plaintiff was represented, was held on June 2, 2009.

On August 25, 2009, ALJ Elliot issued a decision denying plaintiff's application for benefits. That decision became the final decision of the Commissioner on June 3, 2010, when the Appeals Council denied plaintiff's request for review. In the present action, plaintiff challenges that decision.

## Factual Background

Plaintiff was born on January 27, 1959, and was 50 years old at the time of the hearing before the ALJ. He completed the 12th grade, and has past work experience as a construction worker, an auto mall lubrication technician, and a gas station attendant.

## Disability Analysis

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520, 416.920. Below is a summary of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

Step One. The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA). A claimant engaged in such activity is not disabled. If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two. 20 C.F.R. § 404.1520(b).

Step Two. The Commissioner determines whether the claimant has one or more severe impairments. A claimant who does not have such an impairment is not disabled. If the claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case

FINDINGS AND RECOMMENDATION - 3

under Step Three.  20 C.F.R. § 404.1520(c).

Step Three.  Disability cannot be based solely on a severe impairment; therefore, the

Commissioner next determines whether the claimant's impairment "meets or equals" one of

the impairments listed in the SSA regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1.  A

claimant who has such an impairment is disabled.  If the claimant's impairment does not

meet or equal one listed in the regulations, the Commissioner's evaluation of the claimant's

case proceeds under Step Four.  20 C.F.R. § 404.1520(d).

Step Four.  The Commissioner determines whether the  claimant is able to perform

work he or she has done in the past.  A claimant who can perform past relevant work is not

disabled.  If the claimant demonstrates he or she cannot do work performed in the past, the

Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 C.F.R.

§ 404.1520(e).

Step Five.  The Commissioner determines whether the claimant is able to do any

other work.  A claimant who cannot perform other work is disabled.  If the Commissioner

finds that the claimant is able to do other work, the Commissioner must show that a

significant number of jobs exist in the national economy that the claimant can do.  The

Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or

by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix

2.  If the Commissioner demonstrates that a significant number of jobs exist in the national

economy that the claimant can do, the claimant is not disabled.  If the Commissioner does not

meet this burden, the claimant is disabled.  20 C.F.R. § 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the claimant.  Tackett, 180 F.3d

at 1098.  At Step Five, the burden shifts to the Commissioner to show that the claimant can

FINDINGS AND RECOMMENDATION - 4

perform jobs that exist in significant numbers in the national economy.  Id.

## Medical Record

Plaintiff sought emergency treatment on October 26, 2005, after he was involved in a motor vehicle accident.  X-rays showed mild to moderate degenerative changes of the C5 disc level and mild foraminal narrowing.  Cervical thoracic strain was diagnosed, and plaintiff was given a neck collar.

On October 28, 2005, Dr. Jeffrey Beckwith, a primary care physician, noted "marked reduction of neck motions" and diagnosed soft tissue neck and thoracic sprains.  On November 3, 2005, Dr. Beckwith noted that plaintiff continued to experience considerable pain.  He prescribed physical therapy, and opined that plaintiff was "getting better."

On November 3, 2005, plaintiff sought pain medication at an emergency room after his own supply ran out.  A doctor noted "typical neck pain."  Plaintiff was given an injection and 12 Vicodin to take with him.

On November 10, 2005, Dr. Beckwith noted that plaintiff continued to experience headaches, pain, and tenderness, and on December 1, 2005, he noted that plaintiff reported some pain and difficulty "with doing heavier lifting and pushing."

On December 22, 2005, Dr. Beckwith noted that plaintiff continued to report pain despite physical therapy.  Dr. Beckwith expressed concern about plaintiff's "current seeming need for Vicodin" in light of his past amphetamine use.  Plaintiff reported that he was working only three to eight hours a week and was avoiding heavy lifting.

A cervical MRI taken in early February, 2006 showed degenerative disc disease and mild spondylosis at C5-6.  Dr. R.C. Hall noted that he suspected a "concomitant right lateral

FINDINGS AND RECOMMENDATION - 5

disc herniation" as well.

Chart notes dated March 18, 2006, indicate that plaintiff reported that he was performing "light duty" work at a concrete company, and that this work  required him to do a lot of lifting and twisting.  Plaintiff acknowledged that he was taking "a lot of pills."

Dr. Stephen McGirr, a neurosurgeon, examined plaintiff on April 12, 2006.  Plaintiff reported significant pain in his right shoulder and arm, and Dr. McGirr observed a significant loss of function because of pain.  Dr. McGirr noted that plaintiff had numbness in the "C6 distribution."  He diagnosed probable disc herniation at C5-6 and recommended an anterior cervical discectomy with fusion.

Plaintiff visited an emergency room on April 12, 2006, and reported that he had experienced increasing pain after running out of oxycodone.  Plaintiff was given Demerol and Phenergan at the emergency room, and Percocet was prescribed.  He visited an emergency room again on April 22, 2006, complaining of neck pain and seeking narcotic medication. Dr. Robert Graham prescribed Percocet and Norflex, and advised plaintiff that he needed to manage his chronic pain issues through his primary care physician.

On April 25, 2005, plaintiff told Dr. Sally Marie, a physician in Dr. Beckwith's office, that he continued to experience significant pain.  He also told Dr. Marie that his boss was pushing him to do heavier work, but that he thought he could not because of pain and related symptoms in the right side of his neck and numbness radiating down his right arm.  Dr. Marie noted decreased range of motion in the neck and diminished grip on the right.  She diagnosed cervical radiculopathy, prescribed additional physical therapy, and took plaintiff off work for two weeks.

Plaintiff resumed physical therapy in May, 2006, and on July 11, 2006, Dr. Beckwith

FINDINGS AND RECOMMENDATION - 6

indicated that plaintiff's symptoms had "mostly cleared." Dr. Beckwith opined that plaintiff "certainly" did not need surgery at that time, and suggested that the issue of surgery should be revisited only if his condition deteriorated. He returned plaintiff to work for four hours per day for ten days, and indicated that plaintiff could return to work full time after that.

On August 31, 2006, plaintiff told Dr. Beckwith that he had lost his medications while rafting. Dr. Beckwith wrote a prescription for 60 Vicodin. He told plaintiff that he did not want to "trigger a worsening narcotic dependency," and noted that he did not want to "write any more narcotic."

On October 20, 2006, plaintiff again discussed surgery with Dr. McGirr, who told him that he had three options: He could be treated conservatively with non-prescription anti-inflammatories and muscle relaxants, "live with" his symptoms and continue to be somewhat limited in his activities; consider more aggressive physical therapy and possibly a selective nerve block; or undergo the surgery Dr. McGirr had recommended earlier in the year with a "return to a high level of function if not completely back to baseline."

Plaintiff sought treatment for neck pain at an emergency room on February 7 and February 18, 2007. On both occasions, he reported that he had run out of pain medications.

On July 12, 2007, plaintiff saw Dr. Larry Meyers because of neck pain. Dr. Meyers noted that plaintiff had not seen Dr. Beckwith or Dr. Marie since his insurance coverage had ended. Plaintiff reported that he continued to experience neck pain, with a burning sensation down both arms. Dr. Meyers noted that an MRI had shown minimal C5-6 spondylosisthesis with no cord compression, noted a mild decrease in range of motion in plaintiff's neck, and diagnosed chronic neck pain with mild improvement. Dr. Meyers also noted plaintiff's previous methamphetamine and intermittent marijuana use, and added that plaintiff seemed

to want to accept and live with his pain.  He noted that plaintiff was working part-time in construction.  Dr. Meyers prescribed Vicodin, and indicated that he would require plaintiff to agree to make no ER visits, make monthly visits to the clinic and a mental health facility, use no alcohol, and use marijuana "only with permission."

Plaintiff saw Dr. Meyers again on July 26, 2007, and agreed to the conditions of treatment.  Dr. Meyers told plaintiff that he needed to consider non-pharmaceutical treatment for tension and pain, and needed to stretch every morning and find a "fitness activity to get fit."

Stephanie Botts, a nurse practitioner, examined plaintiff on August 15, 2007.  She noted that plaintiff reported chronic neck pain and diagnosed "chronic pain of herniated discs C5-6."  Botts and plaintiff also discussed plaintiff's pain medications.

Plaintiff saw Dr. Meyers again on September 13, 2007.  He reported that he had run out of his medications a day earlier, but was happy with his dosage and experienced no side effects.  Plaintiff said that he was working part-time, but no longer had housing and was living in a "fifth-wheel" with no water or electricity.   A drug screen was positive for marijuana, and negative for other drugs.

In his notes of a visit on November 26, 2007, Dr. Meyers indicated that plaintiff was "not fulfilling his part of the medication agreement," and had not met with staff to go over his goals.  During a visit on December 26, 2007, plaintiff reported that he had been laid off and could not find other work.  Dr. Meyers noted that plaintiff was frustrated, angry, and depressed by lack of work, and had attended mental health counseling and was taking "to heart the counselor's suggestions."

In a telephone call to Dr. Meyers' office on December 28, 2007, plaintiff's wife

reported that plaintiff's best friend and sister had died the day before, and that plaintiff was "getting out of control."

Plaintiff was seen by Dr. Peter Petricelli on February 25, 2008. Plaintiff reported that his level of function had not changed significantly, that he continued to fight with his wife, and that he was unemployed. Plaintiff said that he would have had surgery, but insurance would not cover it. At the time of the visit, he had obtained coverage under the Oregon Health Plan, but it was not clear that this would cover the surgery.

In a visit with Dr. Meyers on April 8, 2008, plaintiff reported that he was experiencing more neck and back pain, with pain radiating into both shoulders. He said that his back bothered him after he had walked less than a mile, and said he could not stand long enough to work. Plaintiff reported that, though he continued to experience moderate to significant pain in his neck, it was low back pain which kept him from walking longer. Dr. Meyers noted that plaintiff had not kept up "with the mental health part or his goal setting," and recommended that he see Dr. McGirr for another opinion.

An MRI of plaintiff's lumbar spine taken on April 16, 2008, showed a "paracentral right broad annular bulge resulting in mild lateral recess stenosis and effacement of descending traversing right S1 nerve root." The MRI showed no significant neural foraminal compromise. A cervical MRI of the same date showed broad-based eccentric right disc bulge resulting in mild central stenosis with bilateral disco-osteophytic disease; mild lateral recess and foraminal compromise, particularly on the right; and mild central canal stenosis at C4-5 resulting from a central disc bulge, with no foraminal compromise. The disc bulge at C5-6 noted earlier was relatively unchanged, but the degree of joint spurring, particularly on the right, was progressive.

FINDINGS AND RECOMMENDATION - 9

During a behavioral health visit on June 18, 2008, plaintiff reported that he would be having back surgery the following month.

James Suiter, a nurse practitioner, saw plaintiff on June 25, 2008.  Suiter described plaintiff as unkempt and characterized his hygiene as poor, and noted that plaintiff reported that he would be having surgery.  Suiter added that the source of that belief was unclear, as Dr. McGirr had not actually stated that surgery would be performed.  He diagnosed chronic back pain/cervical pain and chronic pain syndrome.

In chart notes dated July 11, 2008, Suiter stated that he had seen plaintiff for "disability follow up paperwork."  Suiter reported that he had reviewed all provider notes and imaging results, and concluded that plaintiff suffered from chronic pain syndrome caused by radiculopathy with disc herniation.  Suiter opined that plaintiff had been "continuously totally disabled" and unable to work since October, 2005.

Dr. McGirr saw plaintiff again on July 14, 2008.  Dr. McGirr stated that plaintiff had been "treated well conservatively," but that repeated imaging showed that he continued to have "some degree of spinal canal and right-sided foraminal compromise."  He opined that plaintiff was "probably fated to have his level of symptoms into the future," and added that plaintiff would need to decide whether he could live with the situation or wished to have "something done surgically."

Nurse Practitioner Suiter's notes dated August 18, 2008 indicate that plaintiff had called a number of times seeking an early refill of his pain medications, said he was going to the ER for medications, and was told that this was not appropriate.

Following Dr. Meyers' retirement, plaintiff saw Dr. Brian Jones for the first time on November 14, 2008.  In his notes of a visit on December 2, 2008, Dr. Jones indicated that he

FINDINGS AND RECOMMENDATION - 10

had reviewed plaintiff's records from Dr. Meyers.  Dr. Jones noted that plaintiff had

decreased range of motion to rotation and extension and some tenderness of the paraspinus

muscles, but had full strength in his upper extremities.  He prescribed Norco and Flexeril, and

suggested that plaintiff see Dr. McGirr again "to evaluate further and see if there is anything

else we can do."

During a visit on January 21, 2009, plaintiff told Dr. Jones that he needed to take two

Norco a day.  He reported depression, loss of interest in his usual activities, and a poor sleep

pattern.  Dr. Jones diagnosed major depression and prescribed Citalopram.

During a physical examination on March 5, 2009, plaintiff told Dr. Jones that the

Citalopram was not effective and made him "feel foggy."  Plaintiff acknowledged "a history

of drinking a significant amount of alcohol in the past," and reported that he was drinking 22-

44 ounces of beer daily.  Dr. Jones recommended that he stop drinking alcohol and stop

smoking.

On May 14, 2009, plaintiff was seen by Dr. Richard Huang for follow up to an earlier

Hepatitis C diagnosis.  Plaintiff told Dr. Huang that he had a history of depression and had

taken Prozac in the past, but that he had anger issues on that drug, and was not taking any

other medications.  Dr. Huang indicated that plaintiff had Hepatitis C genotype 1a without

clear clinical signs of advanced liver disease.  He thought that plaintiff might be a good

candidate for treatment, but had some concern about his reported history of depression.  An

ultrasound of plaintiff's abdomen, which Dr. Huang recommended, was normal, and a liver

biopsy he recommended confirmed Hepatitis C with mild activity and portal fibrosis.

Plaintiff saw Dr. Jones again on May 22, 2009, for follow up regarding his

depression.  Dr. Jones noted that Citalopram and Fluoxetine had been ineffective, and

FINDINGS AND RECOMMENDATION - 11

prescribed Effexor.  He noted that Dr. McGirr had scheduled plaintiff for cervical disc

surgery on July 7, 2009.

Plaintiff went to an emergency room on June 16, 2009, to obtain treatment for a stiff

and painful neck.  In response to a call from the emergency room, Dr. Jones said that plaintiff

was using too much pain medication, and recommended that plaintiff be given 6 Norco pills.

In a follow up visit with Dr. Jones on June 26, 2009, plaintiff reported that he had felt

"fuzzy headed" on Effexor, and had stopped taking it 10 days earlier.  Plaintiff reported that

he was "often fidgeting [and] worrying about issues," and had been doing so for a number of

months.  Plaintiff's wife opined that plaintiff's anxiety might be a greater problem than his

depression.  Dr. Jones diagnosed anxiety and depression, and prescribed BuSpar, which he

advised might take a month to become effective.

On July 7, 2009, Dr. McGirr performed a cervical discectomy/fusion at C5-6.

During a visit on July 27, 2009, plaintiff told Dr. Jones that BuSpar was not working

well for him, and that two or three times a week he was experiencing increased anxiety, panic

attacks, and "air hunger"  Dr. Jones tapered plaintiff off BuSpar and prescribed Paxil.

During a visit on September 4, 2009, plaintiff told Dr. Jones that the Paxil caused too

much sedation and had little effect on his anxiety or depression.  Dr. Jones tapered off Paxil

and started plaintiff on Effexor again.

On October 5, 2009, plaintiff asked Dr. Jones for stronger medication to address his

pain following cervical fusion.  Dr. Jones noted his agreement with Dr. McGirr's decision to

discontinue narcotic pain medications.

During a visit on November 12, 2009, plaintiff told Dr. Jones that he continued to

suffer from chronic neck pain, and that the Effexor that had been prescribed was somewhat

FINDINGS AND RECOMMENDATION - 12

effective.  Dr. Jones noted decreased range of motion in plaintiff's neck, prescribed Flexeril, and referred plaintiff to Dr. Kassube for pain management.

In his notes of a visit on November 30, 2009, Dr. Jones expressed concern that plaintiff was using too much Norco.  He noted that plaintiff had decreased range of motion in his neck, and had pain upon palpation in the C7 area.  Plaintiff gave little effort on the left side when Dr. Jones tested his strength, but Dr. Jones rated his reflexes as 2+.

During a visit to Dr. Jones on January 27, 2010, plaintiff reported a burning, tingling painful sensation in his neck, which radiated into his left shoulder.  Dr. Jones opined that plaintiff's cervical pain was probably disc related, and prescribed Neurontin.

## **Hearing Testimony**

### 1. **Plaintiff's testimony**

Plaintiff testified as follows at the hearing:

Plaintiff performed  approximately 15 hours of light duty construction work per week, driving a truck, during 2006 and 2007.  This work ended when there was no more light duty construction work that he could perform.  The work had been difficult for him because of problems with his back and neck, and even simple tasks were a problem because he could not turn his neck.

Plaintiff had injured his lower back in 1989.  It had slowly worsened over the years, and he has had lower back pain most of the time if he over exerted himself.  He could walk approximately 8 blocks before he started to feel pain in his lower back and needed to stop and rest.  Bending, twisting, and standing for any length of time caused problems, and he experienced pain from his neck into his head and shoulders when he moved his head up and

down.  Plaintiff often has numbness across his shoulders and his hands go numb.

Plaintiff's new anti-depressant medication made him feel listless, as if he were "in a fog."  He spent two-thirds of his time in a recliner to support his neck and back, and thought his condition had worsened over time.  He had headaches four or five times a week, and had numbness in his hands more frequently.  When he did light construction work, he had problems performing the work, and was not able to do all the tasks his boss asked him to do.

Plaintiff's medications and narcotics caused him some confusion, and, though he generally gets along with others, he has episodes of anger over small things.

Because the hearing was held before plaintiff underwent a cervical discectomy/fusion at C5-6, testimony did not address plaintiff's condition following the surgery.

2. **Vocational Expert's testimony**

The Vocational Expert (VE) testified that plaintiff had past relevant work as a construction worker and gas station attendant.

The ALJ asked the VE to consider a hypothetical 50 year old individual with plaintiff's education and experience who could frequently lift 10 pounds, could occasionally lift 20 pounds, could walk or stand 6 hours and could sit 6 hours in an 8-hour day, could not climb ladders, ropes or scaffolds, and who could only occasionally stoop and crawl.  In addition, the hypothetical individual should avoid concentrated exposure to hazards such as heights and moving machinery.  The VE testified that such an individual could perform plaintiff's past relevant work as a gas station attendant.

The ALJ posed a second hypothetical in which the individual could lift 10 pounds frequently and occasionally, could stand or walk 2 hours and could sit for six hours in an 8-

hour day, and had the other limitations specified above.  The VE testified that such an individual could not perform any of plaintiff's past relevant work, and would have no transferable skills from past work, but could work as a bench assembler, a document sorter, or an administrative support worker.  He further testified that an individual who regularly missed more than two days of work per month could not sustain competitive employment.

In response to questioning by plaintiff's attorney, the VE testified that an individual described in the first hypothetical who needed to recline or lean back for two hours per day to relieve neck pain could not perform plaintiff's past relevant work or sustain any other competitive employment.

Counsel next asked the VE to add to the first hypothetical the need to hold the head in a fixed position and the inability to move the head up or down or side to side during the work day.  The VE testified that this limitation would affect the ability to perform all work, though he was uncertain to what degree.  He ultimately concluded that this limitation would preclude work as a gas station attendant, the other work he had specified above, or any other positions.

### ALJ's Decision

At the first step of his disability analysis, the ALJ found that plaintiff had not engaged in substantial gainful activity since the date of his alleged onset of disability.

At the second step, he found that plaintiff's chronic hepatitis C and cervical degenerative disc disease were "severe" impairments within the meaning of relevant regulations, and that plaintiff's lower back pain and depression were not.

At the third step, the ALJ found that, either alone or in combination, plaintiff's severe and non-severe impairments did not meet or equal an impairment included in the "listings,"

20 C.F.R.§§ 416.920(a)(4)(iii); 416.920(d).

The ALJ next assessed plaintiff's residual functional capacity (RFC).  He found that plaintiff retained the functional capacity required to perform light work, as defined in 20 § C.F.R. 416.967(b), except that he should not climb ropes, scaffolds, or ladders, should only occasionally stoop or crawl, and should avoid concentrated exposure to hazards such as heights or machinery.  In making this RFC determination, the ALJ found that plaintiff's allegations concerning the intensity, persistence, and limiting effects of his symptoms were not wholly credible.

At the fourth step, based upon the testimony of the VE, the ALJ found that plaintiff could perform his past relevant work as a gas station attendant.  Accordingly, he found that plaintiff was not disabled within the meaning of the Act.


### **Standard of Review**

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The initial burden of proof rests upon the claimant to establish his or her disability.  Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996).  The Commissioner bears the burden of developing the record.  DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).

"Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews, 53 F.3d at 1039.  The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision.  Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986).  The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

**Discussion**

Plaintiff contends that the ALJ erred in failing to properly support his conclusion that plaintiff's allegations were not wholly credible; in failing to find that his depression and low back pain were "severe;" in failing to address the opinion of plaintiff's treating nurse practitioner; and in finding that he retained the functional capacity required to perform his past relevant work as a gas station attendant.

1. **ALJ's Credibility Determination**

**Standards**

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities.  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).  If a claimant produces medical evidence of an underlying impairment, the ALJ  may not discredit the claimant's testimony concerning the severity of symptoms merely because they are unsupported by objective medical evidence.  Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) citing Bunnell v. Sullivan, 947 F.2d 341, 343 (9th Cir. 1990)(*en banc*).  If a

claimant produces the requisite medical evidence and there is no evidence of malingering, an ALJ must provide specific, clear and convincing reasons, supported by substantial evidence, to support a determination that the claimant was not wholly credible. Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002); SSR 96-7p.  If substantial evidence supports the ALJ's credibility determination, that determination must be upheld, even if some of the reasons cited by the ALJ are not correct. Carmickle v. Commissioner of Social Security, 533 F.3d 1155, 1162 (9th Cir. 2008).

    An ALJ rejecting a claimant's testimony may not simply provide "general findings," but instead must identify the testimony that is not credible and the evidence that undermines the claimant's complaints. Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  In addition, SSR 96-7 requires an ALJ to consider the entire record and to consider several factors, including the claimant's daily activities, medications taken and their effectiveness, treatment other than medication, measures other than treatment used to relieve pain or other symptoms, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms."  An ALJ may support a determination that the claimant was not entirely credible by identifying inconsistencies or contradictions between the claimant's complaints and his activities of daily living. Thomas, 278 F.3d at 958-59 (9th Cir. 2002).


**Analysis**

    The ALJ found that plaintiff's impairment could reasonably be expected to cause the symptoms alleged, but that plaintiff's description of the intensity, persistence, and limiting effects of those symptoms was not credible to the extent that it was inconsistent with his RFC assessment.

FINDINGS AND RECOMMENDATION - 18

Because there was no affirmative evidence of malingering, the ALJ was required to provide clear and convincing reasons, supported by substantial evidence in the record, for concluding that plaintiff's allegations were not wholly credible. Plaintiff contends that the ALJ failed to do so. I disagree. The ALJ cited inconsistencies between plaintiff's allegations and the medical record, inconsistencies in plaintiff's allegations, and plaintiff's drug-seeking behavior as reasons for discounting plaintiff's credibility. These reasons are supported by the record, and are sufficient.

Inconsistencies between a claimant's allegations and relevant medical evidence can provide a "clear and convincing" basis for rejecting a claimant's testimony. E.g., Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001). Here, the ALJ noted that, though plaintiff testified that he could not work because of low back pain, neck problems, and difficulty performing simple tasks, the medical record showed that plaintiff rarely cited back pain as a problem, and that clinical signs did not corroborate his allegations on those occasions when he did report back pain. The ALJ noted that, when plaintiff complained of low back pain in December, 2008, objective testing showed that he had nearly full range of motion in his back, his flexion and extension with straight-leg raising was negative, his patellar and Achilles reflexes were 2+ and symmetric, and he had 5/5 strength in his lower extremities. The ALJ noted that plaintiff did not have a physician to treat his lower back. Based upon these factors, the ALJ reasonably concluded that plaintiff's lower back problems were not as severe as plaintiff alleged.

As to plaintiff's testimony concerning plaintiff's cervical impairment, the ALJ cited evidence that plaintiff's level of functioning had been higher than would be consistent with the degree of impairment to which plaintiff testified. The ALJ noted that in June, 2006, after

FINDINGS AND RECOMMENDATION - 19

his alleged onset of disability date, plaintiff reported that he had been riding his bike and hiking, and that in July, 2006, he reported that he had lost his pain medication while rafting. He also noted that plaintiff's treating physician had released him to return to work in July, 2006. In addition, the ALJ noted that plaintiff's allegations of diminished grip strength and headaches were not supported by objective medical evidence.

The ALJ further supported his credibility determination by noting that, after the date that he alleged the onset of disability, plaintiff was able to complete most of the light duty tasks assigned to him in his construction job. He also noted that this employment ended because there was not enough light work for plaintiff to do, and observed that this suggested that plaintiff's functional limitations were not as severe as he alleged. The ALJ noted that plaintiff indicated that he could lift 30-40 pounds and could stand/walk for 30 minutes at a time, and called a "Jobline" to see if there was work available that he could do, which appeared to acknowledge that plaintiff was "capable of working in some capacity."

The ALJ cited plaintiff's inconsistent reports to treatment providers concerning his alcohol use as evidence that plaintiff was not wholly credible. He correctly noted, for example, that, though he reported that he was "not drinking much" at the time, he admitted that he was drinking 22 to 44 ounces of beer per day, and later asserted that he "hardly ever" drank alcohol, though the record indicated a much higher level of alcohol consumption. The ALJ noted that a May, 2009 chart note indicated that, though plaintiff stated that he drank a six-pack of beer per week, the "records show a history of much more significant alcohol use."

The ALJ also cited evidence that plaintiff "may be exaggerating his physical symptoms to obtain narcotic medication" as support for his credibility determination. He correctly noted that plaintiff alleged that he had lost his pain medication, had a history of

FINDINGS AND RECOMMENDATION - 20

taking more medications than were prescribed, was told that he was taking too much pain medication, and was instructed not to seek pain medications through visits to emergency rooms.

The ALJ here provided specific, clear and convincing reasons, supported by substantial evidence in the record, for concluding that plaintiff's allegations were not wholly credible.

## 2. **ALJ's "severe impairments" finding**

Plaintiff contends that the ALJ erred in finding that his severe impairments included only chronic hepatitis C and cervical degenerative disease, and that his depression and low-back pain were not severe impairments.

Claimants bear the burden of establishing the existence of a severe impairment. Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1999).  An impairment must result from abnormalities that can be established by medically acceptable clinical and laboratory diagnostic techniques, 42 U.S.C. § 423(d); 20 C.F.R. § 416.908; SSR 85-28, and is only "severe" if it significantly limits an individual's ability to do basic work acitivities.  20 C.F.R. § 416.921.  An impairment or combination of impairments is not severe if the evidence establishes existence of a slight abnormality that has no more than a minimal effect on an individual's ability to work.  E.g., Smolen v. Chater, 80 F.3d 1272, 1290 (9th Cir. 1996).

The "severe impairments" analysis carried out at step two of the disability determination is intended only to dispose of groundless cases, id., and if the claim is analyzed beyond that step, the ALJ is required to consider all of a claimant's impairments, both severe and non-severe.  SSR 96-8p.  Accordingly, any error in the characterization of impairments at

FINDINGS AND RECOMMENDATION - 21

step two is harmless if the ALJ fully evaluates the claimant's medical condition in the succeeding portion of the analysis.  Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir. 2007).

The ALJ's conclusion that plaintiff's depression did not cause more than a minimal limitation in his ability to perform basic mental work was supported by substantial evidence in the medical record.  The ALJ correctly noted that the medical record did not indicate that plaintiff sought psychiatric treatment for depression and he analyzed plaintiff's mental impairments when he completed the psychiatric review technique process in accordance with 20 C.F.R. § 416.920a.  The ALJ assessed plaintiff's functional limitations according to the four criteria set out in paragraph B of the listings of impairments, and found no limitations in his activities of daily living; mild limitations in social functioning and concentration, persistence, or pace; and no episodes of decompensation.  Only a limitation greater than mild requires a finding of "severe" impairment.  Id.

The Commissioner correctly notes that plaintiff has cited no medical or other credible evidence that plaintiff has mental impairments which interfere with his functioning or significantly limit his ability to do basic work activities.  In the absence of such evidence, the ALJ did not err in determining that plaintiff's depression was not a "severe" impairment.

In addressing plaintiff's low back pain, the ALJ correctly noted that a medically determinable impairment may not be established by symptoms alone, or by a claimant's allegations concerning his symptomatology.  See 20 C.F.R. 404.1528(a), 416.908, SSR 96-4p.  Instead, as the ALJ noted, an impairment must be established based upon an "acceptable medical source."  See SSR 06-03.  The ALJ cited substantial evidence supporting his conclusion that plaintiff's lower back pain did not constitute a "severe" impairment.  He correctly noted that most of plaintiff's treatment had "focused on his neck," and that there

FINDINGS AND RECOMMENDATION - 22

was "little objective medical evidence supporting claimant's allegations concerning a low back impairment." In addition, the record supported the ALJ's conclusion that the evidence indicated that plaintiff's "lower back impairment was not as severe as alleged."

The ALJ sufficiently supported his conclusion that plaintiff had not met his burden of establishing that he had a medically determinable lower back impairment that more than minimally affected his ability to work during the relevant period.

### 3. **Failure to address opinion of plaintiff's treating nurse practitioner**

Plaintiff correctly notes that the ALJ failed to address the opinion of James Suiter, his treating nurse practitioner, who in June, 2008 opined that plaintiff had been "continuously totally disabled" and unable to work since October, 2005. Plaintiff also correctly notes that, according to SSR 06-03p, the opinions of nurse practitioners "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file."

Though I agree that the ALJ should have addressed nurse practitioner Suiter's opinion, I am satisfied that his failure to do so constituted at most harmless error. See, e.g., Stout v. Commissioner, 454 F.3d 1050, 1055 (9th Cir. 2006) (mistake that is not prejudicial or is irrelevant to ALJ's ultimate conclusion as to disability is harmless). Only "acceptable medical sources" can give medical opinions. 20 C.F.R. § 416.927(a)(2), SSR 06-03p. It is significant that, as a family nurse practitioner, Suiter is not considered an "acceptable medical source" under relevant regulations. 20 C.F.R. §416.913.

The Commissioner correctly notes that there was no indication that Suiter in fact treated or examined plaintiff before he completed the form on which he set out his opinion

FINDINGS AND RECOMMENDATION - 23

that plaintiff was "totally disabled."  The Commissioner also correctly asserts that Suiter was the only individual who opined that plaintiff was unable to work, and that Suiter provided no support for that opinion.  The Commissioner notes that the form in question was "apparently completed for private insurance purposes," and reasonably suggests that the definition of disability for the insurer is "likely different."  Further, the reliability of any opinion Suiter offered is seriously undermined by Suiter's assertion that plaintiff was "confined indoors," an observation for which there is no support whatsoever in the record.

It is the responsibility of the ALJ, not a physician, to determine whether a claimant is disabled within the meaning of the Act, and "disability" has both medical and vocational components.  20 C.F.R. § 416.960.  Given the briefness of Suiter's contact with plaintiff, the absence of medical evidence supporting his conclusion that plaintiff had been "continuously totally disabled" since October, 2005, Suiter's obvious error in concluding that plaintiff was "confined indoors" and likely lack of expertise in the vocational aspects of disability, and the absence of agreement with his opinion from any "acceptable medical source" in the record, the ALJ's failure to address Suiter's opinion was harmless, and does not require reversal or remand of the ALJ's decision.


4.  **Conclusion that plaintiff could perform past relevant work**

Plaintiff contends that the ALJ erred in concluding that he could perform his past relevant work as a gas station attendant.  He cites the VE's testimony that an individual who had the limitations to which he testified could not perform his past relevant work or sustain any other employment, and contends that the ALJ erred in rejecting his allegations.

This argument fails.  The ALJ's hypothetical to the VE included all of the limitations

that the ALJ found, based upon the medical evidence and those of plaintiff's allegations which he found credible.  As noted above, the ALJ provided sufficient support for his credibility determination.  Under these circumstances, the ALJ's hypothetical was sufficient, and his conclusion, based upon the VE's testimony,  that plaintiff could perform his past relevant work was supported by substantial evidence in the record.

## Conclusion

The Commissioner's decision denying plaintiff's application for Supplemental Security Income benefits should be AFFIRMED, and a judgment should be entered dismissing this action with prejudice.

## Scheduling Order

This Findings and Recommendation will be referred to a district judge.  Objections, if any, are due January 17 , 2012.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 30th day December, 2011.


  /s/ John Jelderks                            
John Jelderks
U.S. Magistrate Judge


FINDINGS AND RECOMMENDATION - 25